# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **JAMES LEOMA GADDY ET AL** | **CIVIL ACTION** |
| **VERSUS** | **NO. 19-12926** |
| **TAYLOR SEIDENBACH, INC. ET AL** | **SECTION "L" (2)** |

## ORDER & REASONS

Pending before the Court is Defendant's Motion for New Trial and/or Remittitur and Renewed Motion for Judgment as a Matter of Law, R. Doc. 58-1. Plaintiffs oppose the Motion. R. Doc. 84. Oral argument was heard on February 19, 2020. Having considered the parties' arguments and the applicable law, the Court now rules as follows.

## I.    BACKGROUND

Decedent, James Leoma Gaddy, filed a Petition for Damages against various defendants on September 21, 2018 in the Civil District Court for the Parish of Orleans. R. Doc. 1 at ¶ 3. The petition generally alleges that Gaddy was exposed to asbestos while working at International Paper from 1948–1950 and in 1952, and while working as a chemical engineer at Ethyl Corporation's facility from 1955–1960. R. Doc. 1 at ¶ 4. Gaddy filed suit against a number of defendants, including Taylor-Seidenbach, which is domiciled in Louisiana. R. Doc. 1 at ¶ 5. Gaddy is an Arkansas resident. After Gaddy passed away in January 2018, his children were substituted as Plaintiffs. R. Doc. 1 at ¶ 6.

On September 25, 2019, Plaintiffs informed Ethyl that they had reached a settlement agreement with Taylor-Seidenbach, the only remaining Louisiana defendant in the matter. R. Doc. 1 at ¶ 12. Accordingly, Ethyl Corporation, the only remaining defendant, filed a notice of removal

on diversity jurisdiction grounds, as Plaintiffs are citizens of Arkansas and Ethyl Corporation is a citizen of Virginia. R. Doc. 1 at ¶ 14–15. Plaintiffs filed an emergency motion to remand on October 3, 2019, which the Court denied on October 4, 2019. R. Doc. 7.

A jury trial began on November 4, 2019. Plaintiffs' case-in-chief involved the testimony of the decedent, James Leoma Gaddy; Eugene Ponti, the corporate representative of Ethyl Corporation; Susan Raterman, an expert in the field of industrial hygiene, Dr. Richard Kradin, an expert in the field of internal medicine, pulmonology, pathology, and asbestos diseases; Dr. Ted Fish, Dr. Gaddy's treating cardiologist; and James Courtney Gaddy, Dr. Gaddy's son.

After Plaintiffs rested, Ethyl Corporation presented its case, calling Nemore Rayne, a former Ethyl employee; Wallace Armstrong, a former Ethyl employee; James Hamilton, a former Ethyl employee; Dr. James Rock, an expert in the field of industrial hygiene; and Dr. William Breall, an expert in the field of cardiology.

At the close of evidence, both parties made Rule 50 motions for judgment as a matter of law regarding certain aspects of the case. Both motions were denied. Both sides gave closing arguments on the morning of November 8, 2020, and the jury began deliberating. Later that day, the jury returned a verdict in favor of Plaintiffs, finding Ethyl Corporation both negligent and strictly liable, and awarding Plaintiffs $7,500,000.00 in general damages.[1] The jury also awarded $250,661.45 in medical expenses. R. Doc. 50. The jury also found International Paper negligent and strictly liable, and Owens-Illinois liable as a manufacturer of an unreasonably dangerous product. Final judgment was entered on November 20, 2020 in favor of Plaintiffs against Ethyl Corporation for $2,583,553.82, plus legal interest, which represented Ethyl's share of liability after accounting for the virile shares of International Paper and Owens-Illinois. R. Doc. 53.

---

[1] This award was comprised of $2,500,000.00 for physical pain and suffering, $2,500,000.00 for mental anguish, and $2,500,000.00 for loss of enjoyment of life. R. Doc. 50.

## II. PENDING MOTION

Defendant Ethyl timely filed a motion for a new trial or, alternatively, for remittitur. R. Doc. 58. Defendant argues it is entitled to a new trial for the following four reasons: (1) the jury verdict is against the great weight of the evidence; (2) the court committed legal error in permitting inadmissible expert testimony; (3) the jury verdict followed improper conduct by the jury; and (4) the amount of the verdict is so excessive as to shock the conscience.

Defendant also renews its motion for judgment as a matter of law made at trial, arguing Ethyl cannot be held strictly liable for Dr. Gaddy's mesothelioma because any asbestos exposure he experienced at Ethyl was the result of temporary maintenance activities that do not rise to the level of a "defect," as a matter of law, under article 2317.

In opposition, Plaintiffs argue that the trial was fair, the evidence was reliable, and the witnesses were trustworthy and convincing. R. Doc. 80-2 at 9.

## III. LAW

### A. Rule 59(a)(1) Motion for a New Trial or a Remittitur

Federal Rule of Civil Procedure 59 provides that "[t]he court may, on motion, grant a new trial on all or some of the issues—and to any party—as follows: after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A).

Under Rule 59, a new trial may be granted if "the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985) (citations omitted); *see also McFadden v. Wal–Mart Stores*, No. 04-2547, 2006 WL 3087164, at *2 (E.D. La. Oct. 27, 2006). "A district court, however, should attempt to avoid substituting its

judgment for the jury's considered verdict, so as to not violate the parties' Seventh Amendment rights." *Sorina v. Avis Rent–A–Car Sys., Inc.*, 1992 WL 40840, at *1 (E.D. La. Feb. 20, 1992); *see also Wright v. Nat'l Interstate Ins. Co.*, No. CV 16-16214, 2018 WL 2017567, at *3 (E.D. La. May 1, 2018), *aff'd*, 762 F. App'x 201 (5th Cir. 2019). If the jury's verdict is "clearly within the universe of possible awards which are supported by the evidence," the district court should not grant a new trial. *Narcisse v. Illinois Cent. Gulf R. Co.*, 620 F.2d 544, 547 (5th Cir. 1980) (quoting *Bonura v. Sea Land Service, Inc.*, 505 F.2d 665, 670 (5th Cir. 1974)). A district court should not interfere with the factfinder's award of damages unless it is in an amount that "shock[s] the judicial conscience and . . . raise[s] an irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial." *Munn v. Algee*, 924 F.2d 569, 578 (5th Cir. 1991).

Because the matter is before the Court on diversity jurisdiction, the new trial and remittitur standards of Louisiana law are applicable. *See Fair v. Allen*, 669 F.3d 601, 604 (5th Cir. 2012); *Foradori v. Harris*, 523 F.3d 477, 498 (5th Cir. 2008) ("The Supreme Court in *Gasperini* . . . held that, in an action based on state law but tried in federal court by reason of diversity of citizenship, a district court must apply a new trial or remittitur standard according to the state's law controlling jury awards for excessiveness or inadequacy . . . .").

Under Louisiana law, "[a] new trial shall be granted ... [w]hen the verdict or judgment appears clearly contrary to the law and evidence." La. Code Civ. P. 1972(1). "The trial court's discretion in ruling on a motion for new trial is great, and its decision will not be disturbed on appeal absent an abuse of that discretion." *Davis v. Wal–Mart Stores, Inc.*, 774 So. 2d 84, 93 (La. 2000). "Whether to grant a new trial requires a discretionary balancing of many factors." *Id.* (citing *Gibson v. Bossier City Gen. Hosp.*, 594 So. 2d 1332 (La. App. 2 Cir. 1991)). The Louisiana Supreme Court has explained the trial court's discretion as follows:

The fact that a determination on a motion for new trial involves judicial discretion, however, does not imply that the trial court can freely interfere with any verdict with which it disagrees. The discretionary power to grant a new trial must be exercised with considerable caution . . . . Fact finding is the province of the jury, and the trial court must not overstep its duty in overseeing the administration of justice and unnecessarily usurp the jury's responsibility. A motion for new trial solely on the basis of being contrary to the evidence is directed squarely at the accuracy of the jury's factual determinations and must be viewed in that light. Thus, the jury's verdict should not be set aside if it is supportable by any fair interpretation of the evidence.

*Id.* (citing *Gibson*, 594 So. 2d 1332).

In making this determination, the trial court must balance the great deference given to the jury as the factfinder and the discretion bestowed upon the court in reviewing the motion, but the scales are "clearly tilted in favor of the survival of the jury's verdict." *Id.* at 93–94. The trial court's decision to grant or deny a motion for a new trial is to be made on a case-by-case basis. *Id.* at 94.

Furthermore, the Fifth Circuit has repeatedly held that "the decision to grant or deny a motion for new trial generally is within the sound discretion of the trial court and will not be disturbed unless there is an abuse of that discretion or a misapprehension of the law." *Dixon v. International Harvester Co.*, 754 F.2d 573, 586 (5th Cir. 1985); *see also Prytania Park Hotel, Ltd. v. General Star Indemnity Co.*, 179 F.3d 169, 175 (5th Cir. 1999); *Mitchell v. Lone Star Ammunition, Inc.*, 913 F.2d 242, 252 (5th Cir. 1990); *Shows v. Jamison Bedding, Inc.*, 671 F.2d 927, 930 (5th Cir. 1982); *Evers v. Equifax, Inc.*, 650 F.2d 793, 796 (5th Cir. 1981). Moreover, modifying or setting aside a judgment under Rule 59 is an extraordinary remedy; motions for new trial or to alter or amend a judgment should not be avenues for relitigating old matters, raising new arguments, or submitting evidence that could have been presented before. *See Theriot v. Parish of Jefferson*, 66 F. Supp. 1435, 1452 (E.D. La. 1997); *Campbell v. St. Tammany Parish School Board*, No. 98-2605, 1999 WL 777720, at *1 (E.D. La. Sept. 29, 1999). "It is well settled that a jury's damages award should not be disturbed unless it is 'entirely disproportionate to the injury

sustained.'" *Simeon v. T. Smith & Son, Inc.*, 852 F.2d 1421, 1426 (5th Cir. 1988) (quoting *Caldarera v. Eastern Airlines, Inc.*, 705 F.2d 778, 784 (5th Cir. 1983)). Further, "pain and suffering is, to a large degree, not susceptible to monetary quantification, and the jury thus necessarily has especially broad leeway," but still, "[t]he sky is simply not the limit." *Id.* at 1427 (5th Cir. 1988) (citations and quotations omitted).

## B. Rule 50 – Renewed Motion for Judgment as a Matter of Law

After the close of evidence, Ethyl filed a Federal Rule of Civil Procedure 50(a) Motion for Judgment as a Matter of Law on Plaintiff's strict liability claim. R. Doc. 43. The Court denied the motion. Pursuant to Federal Rule of Civil Procedure 50(b), the movant may file a renewed motion for judgment as a matter of law within 28 days after entry of judgment. Fed. R. Civ. P. 50(b). A Rule 50(b) motion in a jury trial case is a "challenge to the legal sufficiency of the evidence supporting the jury's verdict." *Harrington v. Harris*, 118 F.3d 359, 367 (5th Cir. 1997) (quoting *Hiltgen v. Sumrall*, 47 F.3d 695, 699 (5th Cir. 1995)). The Fifth Circuit has noted that in deciding a Rule 50(b) motion, the trial court "consider[s] all of the evidence, drawing all reasonable inferences and resolving all credibility determinations in the light most favorable to the non-moving party." *Brown v. Bryan County, OK*, 219 F.3d 450, 456 (5th Cir. 2000). A judgment as a matter of law should only be granted when "the evidence at trial points so strongly and overwhelming in the movant's favor that reasonable jurors could not reach a contrary conclusion." *Omnitech Int'l Inc. v. Clorox Co. Inc.*, 11 F.3d 1316, 1323 (5th Cir. 1994).

In *Apache Deepwater, L.L.C. v. W&T Offshore, Inc.*, the Fifth Circuit discussed the standard for a Rule 50(b) motion after a jury verdict:

> [O]ur standard of review with respect to a jury verdict is especially deferential. A party is only entitled to judgment as a matter of law on an issue where no reasonable jury would have had a legally sufficient evidentiary basis to find otherwise. In evaluating the evidence, this court credit[s] the non-moving party's evidence and

disregard[s] all evidence favorable to the moving party that the jury is not required to believe.

930 F.3d 647, 653 (5th Cir. 2019) (citations and quotations omitted). Thus, the Fifth Circuit has made it clear that when a jury has rendered its verdict, that verdict should not be disturbed absent strong, overwhelming evidence that shows a reasonable jury could not reach the opposite conclusion. The Court will discuss each issue in turn.

## IV.   DISCUSSION

### A.   Whether there was sufficient evidence to support the jury's determination that Ethyl was negligent

Pursuant to Louisiana's general negligence statute, article 2315, a plaintiff must prove five elements to establish that liability exists under the facts of a particular case: "(1) the defendant had a duty to conform his or her conduct to a specific standard of care; (2) the defendant failed to conform his or her conduct to the appropriate standard of care; (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries; (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries; and (5) actual damages." *S.J. v. Lafayette Parish Sch. Bd.*, 2009-2195 (La. 7/6/10), 41 So.3d 1119, 1125 (citing *Pinsonneault v. Merchants & Farmers Bank & Trust Co.*, 01–2217, p. 6 (La. 4/3/02), 816 So.2d 270, 275–76).

Ethyl challenges the breach and causation elements of Plaintiffs' negligence claim. Specifically, Ethyl contends the jury erroneously found that Ethyl "breached the degree of care reasonabl[y] expected from a corporation acting under the same or similar circumstances of Dr. Gaddy's employment between 1955 and 1959." R. Doc. 58-1 at 3. Ethyl argues that to make such a finding, the jury needed "proof that Ethyl knew, or should have known about the dangers of asbestos at the time of Dr. Gaddy's employment." R. Doc. 58-1 at 3. According to Ethyl, the evidence presented at trial overwhelming indicated that the link between asbestos exposure and

mesothelioma was not known to the medical community until 1960 at the very earliest. R. Doc. 58-1 at 5. Moreover, Ethyl contends it presented evidence that the connection between mesothelioma and low levels of exposure was not known to the medical community until the mid-1970s, over a decade after Dr. Gaddy's employment at Ethyl ended. R. Doc. 58-1 at 5. Ethyl argues that "it defies reason that Ethyl somehow should have known more about the hazards of asbestos than doctors who are publishing medical articles in the Journal of the American Medical Association in 1958." R. Doc. 58-1 at 6.

In opposition, Plaintiffs argue that the evidence at trial clearly demonstrated that Dr. Gaddy was exposed to asbestos in the pilot plant and in the sodium plant during his time at Ethyl. R. Doc. 80-2 at 3. Plaintiffs further argue that the evidence showed that Dr. Gaddy was not provided with any warnings about asbestos while employed there, and that in failing to do so, Ethyl breached its duty of care to Dr. Gaddy. R. Doc. 80-2 at 13. In particular, Plaintiffs point to the testimony of industrial hygiene expert Susan Raterman and medical expert Dr. Richard Kradin, who both testified that a number of scientific studies had associated asbestos exposure with asbestosis in the 1930s and lung cancer in the 1950s. R. Doc. 80-2 at 13.

"Under traditional negligence concepts, the knowledge (actual or constructive) gives rise to the duty to take reasonable steps to protect against injurious consequences resulting from the risk and no responsibility is placed on the owner who acted reasonably but nevertheless failed to discover that the thing presented an unreasonable risk of harm." *Watts v. Georgia-Pac. Corp.*, 2012-0620 (La. App. 1 Cir. 9/16/13), 135 So. 3d 53, 59. Accordingly, the jury's finding of negligence depends in part on whether it reasonably concluded that Ethyl knew, or should have known, about the dangers of asbestos exposure between 1955 and 1959.

There was evidence presented at trial suggesting that companies in Ethyl's position knew, or at least should have known that asbestos exposure was linked to serious illnesses. While the link between asbestos and mesothelioma specifically may not have been discovered and disseminated until the mid-1960s, after Dr. Gaddy left Ethyl, Susan Raterman testified that medical studies published as early as the 1930s demonstrated a link between asbestos exposure and asbestosis and identified exposure controls that could be implemented to minimize exposure. Trial trans. at 345:16–22.

The jury was told that from the 1930s onwards, the National Safety Council and the Industrial Hygiene Foundation published literature about asbestos hazards and that a company with knowledge of these publications should have known that asbestos was a dangerous product in the 1950s. Trial trans. 364:17–20; 365:6–18; 366:6–9. Dr. Kradin bolstered Susan Raterman's testimony, explaining to the jury that not only was asbestos linked to asbestosis in the 1930s, but that the link between asbestos exposure and lung cancer was identified in a 1955 epidemiological study. Trial trans. 491:1–8; 492:4–7; 512:19–21. Even Defendant's expert industrial hygienist, Dr. James Rock, confirmed that "asbestosis" first appeared in medical peer-reviewed literature in 1927 and that the link to lung cancer was demonstrated in 1955. Trial trans. 775:2–5, 20–25. The jury also heard testimony about a variety of state and federal laws that recognized the link between asbestos exposure and serious illnesses. Susan Raterman informed the jury about the Walsh Healey Act of 1951, which set maximum allowable concentrations of asbestos fibers for government contractors, and the Louisiana Worker's Compensation law that included asbestosis in the 1950s. Trial trans. 360:3-17; 362:19-21.

Based on the foregoing, the jury could reasonably find that Ethyl should have known of the risk of asbestos exposure during the time of Dr. Gaddy's employment. The medical community

recognized the link between asbestos and other occupational illnesses, like asbestosis, as early as the 1930s, and lung cancer, as early as 1955. The fact that Ethyl did not recognize the risk of mesothelioma *specifically* is not dispositive here because a jury could reasonably find that Ethyl was on notice that its practices did indeed create a serious risk of future physical injury for its employees. Accordingly, the Court concludes that the jury's finding with respect to this element of negligence should not be displaced.

Ethyl further argues that there is no evidence that any alleged exposure that occurred at Ethyl was a substantial contributing factor of Dr. Gaddy's mesothelioma. R. Doc. 58-1 at 9. In particular, Ethyl argues the evidence at trial demonstrated that Dr. Gaddy was exposed to high levels of asbestos fibers while employed by International Paper in Springfield, Louisiana. R. Doc. 58-1 at 9. Ethyl further explains that Dr. Gaddy's exposure to asbestos at the Baton Rouge facility could not be a substantial contributing cause because he worked primarily out of on office, was rarely in contact with asbestos-containing products, and "never disturbed asbestos containing materials at Ethyl himself." R. Doc. 58-1 at 10. Ethyl notes that the testimony of Mr. Ponti, Ethyl's corporate representative, disputes much of Dr. Gaddy's testimony about the presence and disturbance of asbestos in the sodium plant and proves that asbestos could not feasibly have been disturbed in the manner Plaintiffs argue. R. Doc. 58-1 at 12.

"To determine whether a particular source of exposure to asbestos was a cause-in-fact of a plaintiff's asbestos-related disease, Louisiana courts employ a "substantial factor" test. Simply stated, the particular exposure must be a substantial contributing factor to the plaintiff's disease." *Palermo v. Port of New Orleans*, 2004-1804 (La. App. 4 Cir. 3/15/06), 933 So. 2d 168, 181. In other words, "[w]hen multiple causes of injury are present, a defendant's conduct is a cause in fact if it is a substantial factor generating plaintiff's harm. There can be more than one cause in fact of

an accident as long as each cause bears a proximate relation to the harm that occurs and it is substantial in nature." *Vodanovich v. A.P. Green Industries, Inc.*, 03–1079, pp. 3–4 (La. App. 4 Cir. 3/3/04), 869 So.2d 930, 932–33 (citation omitted). Accordingly, exposure to asbestos while employed at Ethyl need not be the sole contributing cause of Dr. Gaddy's disease.

In this case, there was significant testimony and evidence at trial to support a finding that Dr. Gaddy's exposure to asbestos at Ethyl was a substantial contributing factor to his mesothelioma. Dr. Gaddy explained that he was employed at Ethyl's Baton Rouge, Louisiana facility from 1955 to 1959 as chemical engineer both in the pilot plant and the sodium plant. Trial trans. at 160:16–18. His work in the pilot plant involved the use of insulated pipes, about two or three times a week. *Id.* at 161:2. Removing the insulation on the pipes was "not a routine thing . . . [i]t was an infrequent activity." *Id.* at 161:20–21. However, he testified that repairing the pipe was a "routine activity" and that he worked in proximity to pipes being repaired. *Id.* at 162:1–7. He could not specify a particular time he worked in proximity to pipe repair work but said "there's pipework going on continuously in the plant, so very likely." *Id.* at 164:3–7.

Further, for the majority of his employment at Ethyl, Dr. Gaddy worked in the technical services department of the sodium plant. *Id.* at 150:2–3. In this capacity, Dr. Gaddy often visited and/or observe the sodium cell operators in the sodium cell house. *Id.* at 150:7–10. Work in the sodium plant involved large sodium cells insulated with asbestos spray-on insulation. Dr. Gaddy testified that sodium cells were three or four feet apart and that every one or two years, a cell would have to be refurbished. *Id.* at 151:15–19; 152:3–7. The jury heard Dr. Gaddy explain that a cell was rebuilt by "taking it offline and stripping the brick and the insulation and replacing it." *Id.* at 152:3–7. Dr. Gaddy also testified that the stripping of these cells occurred in the sodium cell house, where he worked as a technical service assistant. *Id.* at 152:1–7; 22–25. Dr. Gaddy also testified

that hot, liquid sodium was carried away from the sodium cells in insulated pipes. These pipes, Dr. Gaddy explained, were often being repaired in the cell house, although he could not recall a specific instance where he personally observed these repairs. *Id.* at 157:22–158:5.

The jury also heard Plaintiffs' industrial hygiene expert, Ms. Raterman, testify that the asbestos fibers would have been disturbed when the sodium cells were being worked on, and that asbestos would have been introduced into the air. She said this "definitely [would be] considered occupational exposure." *Id.* at 377:15–18. Dr. Gaddy also testified that fans were frequently used in the cell house, *id.* at 247:19–248:19, and that employees used brooms to sweep the dust and fibers that accumulated on the concrete floors. *Id.* at 250:17–19. Ms. Raterman testified that this practice would reintroduce asbestos fibers into the air, where employees could inhale them. *Id.* at 378:3-5.

Eugene Ponti, the corporate representative for Ethyl, contradicted Dr. Gaddy's testimony. Mr. Ponti conceded that pipe and sodium cells were often torn out, replaced, and refurbished in the sodium plant, but that this activity did not occur in the cell room. *Id.* at 277:21–22. Unlike Dr. Gaddy, who testified that the sodium cells were three or four feet apart, Mr. Ponti testified that they were only one or two feet apart, making it unfeasible to strip and refurbish them in the sodium cell house. *Id.* at 304:20–305:1. He explained that the sodium cells were insulated with limpet, an asbestos-containing product that was applied to the cells in a brick shed located twenty feet from the sodium cell house. Mr. Ponti testified that the brick house was "an open building on two sides" completely isolated from the sodium cell room. *Id.* at 251:2–22; 302:8–10. Additionally, Mr. Ponti contradicted Dr. Gaddy's testimony regarding the use of insulated pipes in the sodium cell room, testifying that molten sodium was carried from each cell by forklift at the end of the day. *Id.* at 308:17–25.

Nevertheless, considering all of the testimony and evidence presented at trial with respect to negligence, the Court concludes that the jury's verdict does not lack a "legally sufficient evidentiary basis." Fed. R. Civ. P. 50(a). The jury simply believed Plaintiffs' version of the facts and rejected Defendant's version. The Court further concludes that not one of the jury's findings with respect to negligence is against the weight of the evidence.

**B. Whether there was sufficient evidence to support the jury's determination that Ethyl was strictly liable**

Defendant argues that the jury erroneously found Ethyl strictly liable for Dr. Gaddy's mesothelioma and the Court erroneously denied its motion for judgment as a matter of law on the issue made at trial. Ethyl argues that under Louisiana law, undisturbed asbestos does not constitute an unreasonably dangerous defect, and that there was no evidence that Dr. Gaddy was ever exposed to disturbed asbestos. Further, Defendant argues, "Louisiana law recognizes that temporary conditions arising from construction or maintenance activities are not unreasonable risks of harm that can render a premises unreasonably dangerous for purposes of imposing liability on the owner of the site." R. Doc. 43-1 at 3 (citing *Barron v. Webb*, 698 So. 2d 727, 730 (La. App. 2 Cir. 1997)). In Ethyl's view, because the evidence at trial demonstrated that Dr. Gaddy's exposure to asbestos fibers, if any, occurred during impermanent maintenance activities (such as during the stripping and rebuilding of sodium cells), his exposure did not rise to the level required to impose strict liability on Ethyl. R. Doc. 43-1 at 4. In support of this argument, Ethyl relies heavily on *Palermo v. Port of New Orleans*, 2004-1804 (La. App. 4 Cir. 3/15/06), 933 So. 2d 168, 180, in which the court held that a boiler insulated with asbestos did not constitute a vice or defect absent evidence that the asbestos was disturbed, and *Smith v. Union Carbide Corp.*, No. Civ.A. 13-6323, 2014 WL 4930457, at *7 (E.D. La. 2014), in which the court held that the dusty conditions created by

construction and maintenance activities did not constitute a defect under article 2317 because they were temporary in nature.

In opposition, Plaintiff argues that the jury's findings with respect to strict liability were justified. R. Doc. 80-2 at 16. With respect to Defendant's argument that a temporary condition is insufficient to establish a strict liability defect, Plaintiffs distinguish a number of cases in which the temporary condition causing harm did not involve asbestos exposure. R. Doc. 80-2 at 18.

In cases involving long-latency occupational diseases such as mesothelioma, the court must apply the law in effect at the time of the exposure. *Watts*, 135 So. 3d at 59 (citing *Cole v. Celotex Corp.*, 599 So.2d 1058, 1066 (La. 1992)). Accordingly, the Court will consider the language of article 2317 in effect between 1955 and 1959. Under this version of article 2317, a plaintiff can succeed on a strict liability claim by proving that 1) the injury-causing thing was in the care, custody, and control of the defendant; 2) the thing had a vice or defect that created an unreasonable risk of harm; and 3) the plaintiff's injuries were caused by the vice or defect. *Palermo*, 933 So. 2d at 179. "A defect for the purposes of article 2317 is a flaw or condition of relative permanence inherent in the thing as one of its qualities." *Crane v. Exxon Corp., U.S.A.*, 613 So. 2d 214, 219 (La. Ct. App. 1992). Unlike with a negligence claim, in a strict liability case under this version of article 2317, the plaintiff is relieved of having to prove that the owner knew or should have known of the risk. *Watts*, 135 So. 3d at 60. "Under strict liability concepts, the mere fact of the owner's relationship with and responsibility for the damage-causing thing gives rise to an absolute duty to discover the risks presented by the thing in custody." *Id.*

The parties do not dispute that the asbestos fibers were in the care, custody, and control of Ethyl. Further, as discussed above, the jury's finding that asbestos exposure at Ethyl substantially contributed to Dr. Gaddy's diagnosis was reasonable. The main dispute involving strict liability

turns on whether the asbestos exposure constitutes a "defect" under the version of article 2317 in effect between 1955 and 1959.

"A temporary condition may constitute a hazard, but it does not constitute a defect as contemplated by article 2317." *Dauzat v. Thompson Const. Co.*, 02-989 (La. App. 5 Cir. 1/28/03), 839 So. 2d 319, 323 (holding that a hole in a concrete slab was a temporary condition that precluded strict liability under article 2317). Ethyl argues that Dr. Gaddy's asbestos exposure, if any, resulted from asbestos dust created by temporary maintenance activities. In support of this argument, Ethyl relies heavily on *Smith*, in which the court held that the dusty conditions created by construction and maintenance were "temporary in nature" and therefore did not constitute an article 2317 defect. 2014 WL 4930457, at *7. The plaintiff in *Smith* was a pipe insulator who was contracted to work on various job sites for short periods of time doing construction work. His work involved cutting pipes, insulating pipes, and mixing asbestos cement. *Smith,* 2014 WL 4930457, at *1. Similarly here, it is not the asbestos itself that presents an unreasonable risk of harm but the dusty conditions created by the disturbance of the material. Unlike the plaintiff in *Smith*, however, Dr. Gaddy was a permanent employee of Ethyl. Further, he testified that the tear-out and reconstruction of sodium cells was a constant activity. Trial trans. at 159:4–7. Even Mr. Ponti, Ethyl's corporate representative, testified that of the seventy-seven sodium cells, one or two were continuously being taken off line and refurbished on a weekly basis. *Id.* at 246:7–9. Considering the fact that the stripping and refurbishment of sodium cells was a constant and necessary activity to keep the plant operational, the Court concludes that the asbestos dust was not a "temporary condition" arising from construction and maintenance. The continuing refurbishment was indeed a standard operating procedure at the facility.

The other cases cited by Defendant do not involve asbestos exposure and are not applicable here because they involve much more obviously temporary defects. For example, in *Crane v. Exxon Corporation, U.S.A.*, the court held that an open chute in a concrete slab was not an article 2317 defect because it was meant to be filled with electric conduit and covered with a grating. 613 So. 2d 214, 219. Similarly in *Dauzat v. Thompson Const. Co., Inc.*, a hole in the middle of a concrete slab did not trigger strict liability because it "was not going to be left in the middle of the store when construction was completed." 839 So. 2d at 323. In *Hammons v. Forest Oil Corp*, slippery conditions caused by the discharge of fluid and sludge from a pipe was a temporary condition precluding strict liability because it occurred during a construction project. Further, the sludge was periodically cleared from the deck and was an obvious hazard. 2008 WL 348765 (E.D. La. 2008). Unlike these cases, the asbestos dust created by the continuous refurbishment of sodium cells was not a temporary construction activity because, as Dr. Gaddy and Mr. Ponti testified, it happened all the time. It was part and parcel of the Baton Rouge facility's operation. Without the constant cycle of refurbishment, the sodium cell plant would cease to operate. Accordingly, Ethyl's motion regarding strict liability is denied.

## C. Whether the Court committed legal error in allowing the testimony of Dr. Susan Raterman

Ethyl contends the Court committed legal error by allowing Plaintiffs' expert, Susan Raterman, to testify that "the ventilation in the sodium cell building 'pulled' asbestos fibers from the sodium cell refurbishment area located at an area isolated from the sodium cell buildings." R. Doc. 58-1 at 17. Ethyl characterizes this argument a "a hodgepodge of unproven assumptions, not the result of any scientific analysis or any analysis whatsoever." R. Doc. 58-1 at 17. Ethyl argues that Ms. Raterman's testimony regarding "fiber drift" is inadmissible because she did not disclose

the methodology with which she formed the opinion in her expert report, nor did she perform any calculations of models to predict air flow in the space. R. Doc. 58-1 at 20. Further, Ethyl argues her testimony is unreliable because she has never authored a peer reviewed article about asbestos exposure assessment and her fiber drift theory was not corroborated or validated by any scientific literature. R. Doc. 58-1 at 20. Lastly, Ethyl explains that Ms. Raterman's theory is wholly untestable and accordingly is "of no practical value in the courtroom." R. Doc. 58-1 at 21.

In opposition, Plaintiffs argue that Ms. Raterman's testimony was admissible. R. Doc. 80-2 at 18. Plaintiffs characterize Defendant's attack as requesting that this Court "require an expert to base her opinions on something more than her observations and experience." R. Doc. 80-2 at 19.

The admissibility of expert testimony is governed by Rule 702 of the Federal Rule of Evidence, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. This rule codifies the Supreme Court's decisions in *Daubert v. Merrell Dow Pharma., Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).

The Court must act as a "gate-keeper" to ensure the proffered expert testimony is "both reliable and relevant." *Wells v. SmithKline Beecham Corp.*, 601 F.3d 375, 378 (5th Cir. 2010). "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* (quoting *Daubert*, 509 U.S. at 592–93). With respect to reliability,

the Court's focus "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595.

When the admissibility of expert testimony is challenged under *Daubert*, the proponent of the evidence bears the burden of proving that the testimony is reliable and relevant. *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc). To meet this burden, a party cannot simply rely on its expert's assurances that he or she has utilized generally accepted scientific methodology. *Id.* Rather, some objective, independent validation of the expert's methodology is required. *Id.* In this regard, however, for purposes of Rule 702, it is not necessary for the proponent of the evidence to prove that "the testimony is factually correct." *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009).

Ultimately, a court's role as a gatekeeper does not replace the adversary system. *Daubert*, 509 U.S. at 596. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* Proper deference is to be accorded to the jury's role "as the arbiter of disputes between conflicting opinions." *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996) (quoting *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir. 1987)). "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *Id.* (quoting *Viterbo*, 826 F.2d at 422).

Susan Raterman was qualified and testified as an expert in the field of industrial hygiene. It is undisputed that the theory she posited regarding how asbestos fibers could have drifted from one area of the plant to another through the ventilation systems was not corroborated by mathematical modeling using air sampling data from the time of Dr. Gaddy's employment at Ethyl.

However, Ms. Raterman explained that scientific modeling to prove this theory would be impossible because there was no air sampling data collected at Ethyl between 1955 and 1959. Trial trans. at 424:19–23; 425:4–7. For this reason, Ms. Raterman explained that she conducted her analysis and formulated her opinion by looking at other literature that described fiber movement in similar conditions. In particular, she looked at "air sampling that's been done in various different settings to demonstrate the movement of fibers from one area to another . . . over the course of 20 feet, 30 feet, and more." *Id.* at 425:8–9, 426:7–17. She explained that while the conditions she studied were not the exact conditions at Ethyl, "they constitute a similar group. They can't replicate the exact conditions because we don't know the exact conditions." *Id.* at 427:21-23. The jury was informed that this fiber drift theory was not the product of precise calculations of scientific modeling and Ms. Raterman explained to the jury the scientific literature she relied upon in forming her conclusion.

Moreover, the Court notes that the allegedly improper "fiber drift" theory is only one theory of exposure proposed by Ms. Raterman. In addition to this theory, Ms. Raterman testified that Dr. Gaddy was exposed by his own work in the sodium cell house. Ms. Raterman explained that she listened to Dr. Gaddy's testimony and concluded that asbestos was disturbed in his direct work area by the stripping and refurbishment of sodium cells. *Id.* at 374:17–21; 424:2–12. As noted above, the jury's conclusion that Dr. Gaddy worked in proximity to sodium cells being stripped and refurbished in the sodium cell house was not against the great weight of the evidence. She specifically testified, "Assuming the limpet was stripped from sodium cells *in Dr. Gaddy's work area*, it indicates to me that substantial concentrations of asbestos had the opportunity to become airborne and breathed in by the individuals in the vicinity." *Id.* at 374:17–21 (emphasis added). This practice, she explained, would easily cause the re-entrainment of asbestos fibers into the air

in the sodium cell house. *Id.* at 376:22–377:7. Accordingly, the jury was presented with ample expert testimony discussing the ways in which Dr. Gaddy was exposed. Further, Defendants had the opportunity and incentive to vigorously cross-examine Ms. Raterman at trial, suggesting that deference should be granted to the jury's decision to believe her testimony. Accordingly, Defendant's motion with respect to Ms. Raterman's testimony is denied.

### D. Whether the jury partook in improper conduct

"It is well settled that a district court has broad discretion in deciding whether to grant a new trial for juror misconduct." *Carson v. Polley*, 689 F.2d 562, 580 (5th Cir. 1982). "Because the context in which alleged juror misconduct arises is different in every case, whether a new trial should be granted must be decided on an ad hoc basis." *Garcia v. Murphy Pac. Marine Salvaging Co.*, 476 F.2d 303, 306 (5th Cir. 1973). "In this circuit, a defendant seeking a new trial based on juror misconduct must prove (1) misconduct by at least one juror that (2) prejudiced the defendant to the extent that it undermined the fairness of the trial." *United States v. Villalobos*, 601 F. App'x 274, 277 (5th Cir. 2015). A presumption of prejudice arises when the jury is "tainted by outside influence," but not when "jurors themselves have violated an instruction of the court." *Id.*

Ethyl contends a new trial is warranted because a juror appeared to be sleeping at multiple instances during the trial. R. Doc. 58-1 at 22. In opposition, Plaintiffs argue that any instances of juror inattention were addressed by the Court during trial and effectively dealt with whether in open court or in a private meeting with the jury in chambers. R. Doc. 80-2 at 21.

A motion for a new trial may be granted when there is evidence that jury misconduct prejudices or contaminates their deliberative process. *See Auto-Owners Ins. Co. v. Southeast Floating Docks, Inc.*, 934 F.2d 1211, 1215 & n.3 (11th Cir. 1991). While sleeping may amount to juror misconduct, *see United States v. Rivera*, 295 F.3d 461, 470 (5th Cir. 2002), the Court does

not find that the brief moments of apparent inattention by one juror prejudiced Ethyl's right to a fair trial in this case. The Court was apprised of a juror's apparent dosing and responded promptly to the problem. Frequent breaks were taken, coffee was provided, and the Court even met with the jury in chambers to remind them of their duty and implore them to pay attention. The record supports the conclusion that the entire jury engaged in a thoughtful deliberation that lasted several hours. Accordingly, the Court concludes that a new trial is not warranted for jury misconduct.

### E. Whether the jury's damage award was excessive and contrary to the law and evidence

Rule 59(a)(1)(A) permits a court to grant a new trial when the jury's award is excessive and against the great weight of the evidence in a manner that suggests bias or prejudice. *See Brunnemann v. Terra Int'l, Inc.*, 975 F.2d 175, 178 (5th Cir. 1992). However, remittitur, not a new trial, is the appropriate remedy when the award is "so large as to appear contrary to right reason." *Id.*

The Fifth Circuit has held numerous times that an assessment of damages is a factual finding reviewed under the clearly erroneous standard. *Hernandez v. M/V Rajaan*, 841 F.2d 582, 587 (5th Cir. 1988) (citing *Sosa v. M/V LAGO IZABAL*, 736 F.2d 1028, 1035 (5th Cir. 1984)). "This court will not overturn a damage award unless the trier of fact abused its discretion." *Id.* (citing *Bartholomew v. CNG Producing Co.*, 832 F.2d 326, 331 (5th Cir. 1987)). "An award is excessive only if it is greater than the maximum amount the trier of fact could properly have awarded." *Moore v. M/V ANGELA*, 353 F.3d 376, 384 (5th Cir. 2003) (citing *Sosa*, 736 F.2d at 1035).

Courts in the Fifth Circuit apply the "maximum recovery rule" to determine whether an award is excessive. *Puga v. RCX Sols., Inc.,* 922 F.3d 285, 297 (5th Cir. 2019). Under the maximum recovery rule, "the verdict must be reduced to the maximum amount the jury could

properly have awarded." *Brunnemann v. Terra Int'l, Inc.*, 975 F.2d 175, 178 (5th Cir. 1992) (quoting *Hansen v. Johns–Manville Products Corp.*, 734 F.2d 1036 (5th Cir.1984)). However, courts "will decline to reduce damages where the amount awarded is not disproportionate to at least one factually similar case from the relevant jurisdiction." *Id.* (quoting *Lebron v. United States*, 279 F.3d 321, 326 (5th Cir. 2002)). For purposes of the maximum recovery rule, the "relevant jurisdiction" in a diversity case is the forum state. *Longoria v. Hunter Express, Ltd.*, 932 F.3d 360, 365 (5th Cir. 2019); *see also Puga v. RCX Sols., Inc.*, 922 F.3d 285, 297 (5th Cir. 2019) ("The relevant jurisdiction for purposes of the maximum recovery rule 'is the state providing the substantive law for the claim.'" (quoting *Vogler*, 352 F.3d at 156)). Nevertheless, "[b]ecause the facts of each case are different, prior damages awards are not always controlling; a departure from prior awards is merited 'if unique facts are present that are not reflected within the controlling caselaw.'" *Lebron*, 279 F.3d at 326 (quoting *Douglass v. Delta Air Lines, Inc.*, 897 F.2d 1336, 1339 (5th Cir. 1990)).

A jury's award of general damages is entitled to great discretion, in part because general damages are "inherently speculative in nature and cannot be fixed with mathematical certainty." *Bouquet v. Wal–Mart Stores, Inc.*, 2008-0309 (La. 4/4/08), 979 So. 2d 456, 458. Because a jury is in the "best position to evaluate witness credibility and see the evidence firsthand," *Romano v. Metro. Life Ins. Co.*, 2016-0954 (La. App. 4 Cir. 5/24/17), 221 So. 3d 176, 183, its decision will not be disturbed absent an abuse of discretion. Whether a jury abused its discretion in awarding a particular measure of general damages is a sensitive fact-specific inquiry, in large part because "[r]easonable persons frequently disagree about the measure of general damages in a particular case." *Youn v. Mar. Overseas Corp.*, 623 So. 2d 1257, 1261 (La. 1993). Nevertheless, a jury abuses

its discretion when it awards damages "beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff." *Id.*

Ethyl argues that the general damages awarded were grossly disproportionate to the special damages awarded in this matter and disparate from the typical measure of general damages awarded in similar cases. R. Doc. 58-1 at 23. The Court agrees. Although Dr. Gaddy suffered from what one expert testified was "one of the worst cancers in the whole world," Trial trans. at 886:13–17, he suffered from a variety of afflictions that contributed to his loss of enjoyment of life and mental anguish. Further, Dr. Gaddy himself testified that he did not suffer physical pain as a result of his disease. Records from his frequent medical appointments reveal that he was never treated for pain stemming from mesothelioma. The Court recognizes that the jury was presumably influenced by Dr. Gaddy's video testimony, in which he spoke slowly through labored breaths, and the medical testimony discussing the effects of mesothelioma on human lungs. Further, Dr. Gaddy's son testified that his father was not a man to complain of physical discomfort. This testimony was powerful, and the jury was justified to rely on it. Nevertheless, the plain evidence presented at trial does not justify an award as large as that granted by the jury, particularly for an eighty-six-year-old man who testified to experiencing little plain and passed away six months after receiving his diagnosis. Considering this particular plaintiff and the particular circumstances of this case, the general damages awarded here simply are not within the range that a reasonable jury could have appropriately awarded based on the evidence.

Jury awards in comparable cases support this finding. The most factually similar case the Court discovered is *White v. Entergy Gulf States Louisiana, L.L.C.*, 2013-1608 (La. App. 1 Cir. 11/10/14), 167 So. 3d 764, 772. In that case, the Louisiana First Circuit Court of Appeal upheld a $3,800,000.00 general damage award to compensate the survivors of a seventy-nine-year-old

mesothelioma victim. The *White* plaintiff began hospice care shortly after his diagnosis and died just over one month later. 167 So. 3d at 767. Although the plaintiff was described as a "stoic man" with a "tough nature" who never complained about pain, testimony at trial revealed that he was frail, suffered from fluid retention and mouth sores, could not chew or eat his food, and lost weight. *Id.* at 771–72. In other cases, Louisiana juries awarded lesser sums for pain and suffering even in light of evidence that the plaintiff's suffering was a "ten out of ten," *Roberts v. Owens-Corning Fiberglas Corp.*, 2003-0248 (La. App. 1 Cir. 4/2/04), 878 So. 2d 631, 644, or required large amounts of pain medication, *Hennegan v. Cooper/T. Smith Stevedoring Co.*, 2002-0282 (La. App. 4 Cir. 12/30/02), 837 So. 2d 96, 101. In the present case, the jury awarded almost twice the award upheld in *White*, and considering the factual similarities between those cases, this award was clearly excessive.

Having found that the jury's award was excessive, the Court must now determine the highest amount the jury could have awarded based on the evidence without abusing its discretion. In applying the maximum recovery rule, the Court must consider comparable cases from the relevant jurisdiction. *See Puga*, 922 F.3d at 297. A review of factually similar cases reveals that juries in this jurisdiction typically award between $1,500,000.00 and $3,000,000.00 for the types of injuries Dr. Gaddy sustained. The Court reviews a number of these cases below.

For example, in *Chaisson v. Avondale Indus., Inc.*, the court upheld an award of $1,416,580.54 in survival damages for the death of a pipefitter's wife who developed mesothelioma after being exposed to fibers on her husband's clothes when he returned home from work. 2005-1511 (La. App. 4 Cir. 12/20/06), 947 So. 2d 171, 179. The court did not provide much commentary on the decedent's pain and suffering but noted that one of the plaintiff's children testified to knowing that her mother was in pain from her facial expressions. *See id.* at 199.

In *Torrejon v. Mobil Oil Co.*, the court upheld an award of $1,800,000.00 million where the mesothelioma victim experienced great pain and suffering. The evidence showed that he lost 40 pounds, could not bath himself, developed bed sores, and was prescribed a large amount of pain medication. 2003-1426 (La. App. 4 Cir. 6/2/04), 876 So. 2d 877, 895.

In *Hennegan*, the Court found that an award of $2,500,000.00 in general damages was not an abuse of discretion in a case involving a seaman who died of malignant mesothelioma. 837 So. 2d at 101. The court held similarly in *Zimko v. American Cyanamid*, upholding an award of $2,500,000.00 in general damages for a survival action. 2003–0658 (La. App. 4 Cir. 6/8/05), 905 So.2d 465.

In *Roberts*, the court found that a $3,000,000.00 general damage award was not an abuse of discretion when the plaintiff, who suffered from mesothelioma, told his doctors his pain was a "ten out of ten." His doctor testified that mesothelioma is incredibly painful, and the record demonstrated that his morphine pump could only alleviate so much suffering. The court noted that the plaintiff died a year after his diagnosis after suffering much despondency and humiliation. 878 So. 2d 631.

However, a general damage award of $3,000,000.00 does not appear to be a hard and fast limit. As described above, the survivors of a seventy-nine-year-old mesothelioma victim in *White* were awarded $3,800,000.00. 167 So. 3d at 772. In *White*, the plaintiff died just one month after his diagnosis, although evidence at trial demonstrated that he had symptoms of asbestos related diseases as early as 2005. *Id.* at 771. The plaintiff's daughter described her father as a "stoic man" who never complained about pain, and his son testified that due to his father's "tough nature," his father never honestly admitted to feeing pain. *Id.* Nevertheless, his family testified that the plaintiff suffered, both physically and mentally, and that he was frail, suffered from fluid retention and

mouth sores, could not chew or eat his food, and lost weight. *Id.* at 772. Furthermore, the plaintiff was treated with morphine at the end of his life. *Id.* at 771. His doctor testified that at the end of his life, the plaintiff was miserable and in pain. *Id.*

Additionally, in *Terrance v. Dow Chemical Company*, the Louisiana First Circuit Court of Appeal upheld a $5,000,000.00 general damage award to a mesothelioma victim who "suffered incredible pain and numerous hospitalizations, painful procedures, nausea, severe weight loss, and fatigue," and used "powerful pain medication" in the months leading up to his death. 2006-2234 (La. App. 1 Cir. 9/14/07), 971 So. 2d 1058, 1071. This award, the Court concluded was "arguably on the high end," but not an abuse of discretion. *Id.*

In contrast to most of these plaintiffs, Dr. Gaddy testified at the time of his deposition some three month before his demise that he did not experience much pain from his disease. Trial trans. at 126: 1–3. Like the plaintiff in *White*, Dr. Gaddy's medical records reveal that he did not report pain to his treating physicians. However, Dr. Gaddy's son testified that Dr. Gaddy was a stoic man who never complained of pain. *Id.* at 609:10–24; 610:13–24. Photographs and videos taken shortly before his death clearly show a feeble, emaciated man, hooked up to a breathing machine in apparent discomfort. Additionally, like in *White*, the trial involved convincing medical testimony. Dr. Breal, Defendant's medical expert, called mesothelioma "one of the worst cancers in the world." *Id.* at 884:19–20. Dr. Fish, Dr. Gaddy's treating physician, explained that mesothelioma made Dr. Gaddy weak and listless, reduced his energy, caused him to suffer from depression and lack of appetite. *Id.* at 599:13-22. Dr. Gaddy himself testified that he had sores in mouth and on his arms that made eating difficult. *Id.* at 127:8–12. Dr. Gaddy underwent several medical procedures related to mesothelioma and procedures to drain the fluid from his lungs. *Id.* at 127:5–7; 128:18–20; 129:10–12. However, unlike the Plaintiff in *White*, who likely suffered the

symptoms of mesothelioma for at least six years, there was no suggestion that Dr. Gaddy suffered from mesothelioma-like symptoms long before his diagnosis. Additionally, there was evidence presented that Dr. Gaddy suffered from unrelated heart problems that caused him discomfort before his diagnosis and were exacerbated by his mesothelioma. *Id.* at 566:11–18, 602:12–603:9. Accordingly, while factual similar, *White* is not entirely analogous. Therefore, the Court is inclined to follow *White*'s lead to the extent it authorizes a larger general damage award than the majority of cases but declines to apply the very same award.

Considering the foregoing, the Court concludes that the jury's general damage award of $7,500,000.00 was excessive. Most survival actions involving mesothelioma have generated recoveries ranging from $1,500,000.00 to $3,000,000.00.[2] Furthermore, the majority of these cases involve more evidence of obvious and extreme pain and suffering. Nevertheless, *White* suggests that there is some support for a large general damage award even when the evidence of pain and suffering comes primarily from the testimony of medical experts and the plaintiff's family. However, the Court recognizes that the award in *White* was "arguably on the high end" and involved at least marginally more evidence of pain and suffering than the instant matter. After reviewing all of the evidence in the record and recalling the testimony of the witnesses, the Court, applying the maximum recovery rule, concludes that an appropriate award in this case is $3,000,000.00 in general damages in addition to medical expenses of $250,661.45, for a total award of $3,250,661.45. In the event Plaintiffs refuse to remit, the Court will order a new trial.

## V.   CONCLUSION

Considering the foregoing,

---

[2] While there are some cases involving much larger recoveries, *see e.g.*, *Terrance*, 971 So. 2d 1058, these cases seem like outliers and are factually distinguishable.

**IT IS ORDERED** that Defendant's Motion for New Trial and/or Remittitur and Renewed Motion for Judgment as a Matter of Law is **GRANTED IN PART** and **DENIED IN PART**.

It is **GRANTED** to the extent Defendant seeks remittitur. The damage award is remitted to $3,250,661.45, which constitutes $3,000,000.00 in general damages and $250,661.45 in medical expenses. Plaintiffs must file either an acceptance of the remittitur or notice of intent to retry the case within twenty-one days of this Order's issuance.

It is **DENIED** to the extent Defendant seeks judgment as a matter of law.

New Orleans, Louisiana this 4th day of March, 2020.

_____
Eldon E. Fallon
United States District Judge