# United States Court of Appeals
## for the Fifth Circuit

---

United States Court of Appeals
Fifth Circuit

**FILED**

December 14, 2020

Lyle W. Cayce
Clerk

No. 20-30209

---

THERESA G. ADAMS; JAMES C. GADDY,

*Plaintiffs—Appellants,*

*versus*

ETHYL CORPORATION, FORMERLY KNOWN AS ETHYL
CHEMICAL,

*Defendant—Appellee,*

CONSOLIDATED WITH

---

No. 20-30242

---

THERESA G. ADAMS; JAMES C. GADDY,

*Plaintiffs—Appellees,*

*versus*

ETHYL CORPORATION, FORMERLY KNOWN AS ETHYL
CHEMICAL,

*Defendant—Appellant.*

---

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:19-CV-12926

---

Before Owen, *Chief Judge*, and King and Engelhardt, *Circuit Judges*.
Per Curiam:*

As a young chemical engineer in the 1950s, Dr. James L. Gaddy ("Dr. Gaddy") worked at Ethyl Corp. ("Ethyl"). In July 2018, he was diagnosed with mesothelioma. Soon after that diagnosis, he sued Ethyl and other defendants, alleging that his mesothelioma was caused by exposure to asbestos that occurred, in part, when he worked at Ethyl. Sadly, Dr. Gaddy passed away before his case went to trial. His children, Theresa Adams and James C. Gaddy ("Plaintiffs"), were substituted as his statutory survivors.

A jury found Ethyl partially liable under theories of strict liability and negligence. It awarded Plaintiffs general damages of $7,500,000. Considering that amount excessive, the district court granted in part Ethyl's motion for remittitur and reduced the total general damages amount to $3,000,000. But the district court otherwise denied Ethyl's motion for a new trial and Ethyl's motion for judgment as a matter of law. It also denied Plaintiffs' motion for judgment as a matter of law concerning the jury's allocation of liability. Both Ethyl and Plaintiffs appeal various aspects of these rulings. We AFFIRM.

---

* Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

No. 20-30209
c/w No. 20-30242

# I.  BACKGROUND

Dr. Gaddy alleged that he was exposed to asbestos during his time working for two different employers: first at International Paper and later at Ethyl.

## A.  International Paper

As a college student in the early 1950s, Dr. Gaddy worked as a summer laborer and pipefitter's helper at the International Paper plant in Springhill, Louisiana.[1]  His work assignments at the paper mill took him throughout much of the plant, and regularly involved removing insulation to access pipe flanges in order to repair and replace piping.  Dr. Gaddy testified in his deposition that he might sometimes spend an entire day removing insulation at International Paper; he could not recall ever being offered protective equipment.

During the period when Dr. Gaddy worked at International Paper, a company called Owens-Illinois manufactured Kaylo pipe covering ("Kaylo")—a thermal insulation product that contained asbestos.  Two expert witnesses testified at trial that Owens-Illinois manufactured Kaylo at the time of Dr. Gaddy's employment there in the early 1950s.  Numerous invoices from the same period show that International Paper purchased immense quantities of Kaylo and had it shipped to its Springhill plant where Dr. Gaddy worked.  The headings on these invoices indicate that they were generated by Owens-Corning—an entity that, despite its similar name, was distinct from Owens-Illinois and is now defunct.  The relationship between

---

[1] Dr. Gaddy testified that he worked at International Paper as a "summer job" while he was in college and possibly one summer before college, and that after completing college he began working for Ethyl in 1955.  Thus, while the record is not clear on the precise years that he worked at International Paper, his work there occurred before—and possibly during—1955, but no later.

3

Owens-Illinois and Owens-Corning, if any, was never mentioned or described by either party at trial—at least not until, during its closing argument, Ethyl stated that Owens-Illinois manufactured Kaylo and "used the company called Owens[-]Corning to distribute" it.

Although the invoices show that Kaylo was sold and shipped to International Paper's Springhill plant, no direct evidence showed that Dr. Gaddy had dealt specifically with Kaylo at International Paper. Nonetheless, Dr. Gaddy described in detail how he regularly tore out thermal insulation when he worked there. And none of the evidence presented showed any other thermal insulation being shipped to or used at International Paper during the relevant timeframe. Moreover, if the insulation Dr. Gaddy described dealing with was in fact Kaylo, one expert witness testified that such interaction would have resulted in significant exposures to asbestos.

## B. Ethyl

After completing his undergraduate education, Dr. Gaddy accepted a chemical engineering position at Ethyl, where he worked from 1955 to 1959. During that time, Dr. Gaddy worked in two areas of the chemical plant: the Pilot Plant and the Sodium Plant. The Pilot Plant performed processes that resulted in high temperatures and in turn required thermal pipe insulation. A 1986 inter-office memorandum at Ethyl stated that pipe insulation containing asbestos was widely used at the Pilot Plant until 1969, and hundreds of linear feet of insulation containing asbestos were still present at the Pilot Plant when Ethyl dismantled it in the mid-1980s. Dr. Gaddy labored at the Pilot Plant for approximately one year, regularly working with, and in proximity to, insulated pipes. He testified that insulated pipes were routinely repaired in the plant, which occasionally resulted in disturbed pipe insulation within his vicinity.

No. 20-30209
c/w No. 20-30242

Dr. Gaddy also worked in Ethyl's Sodium Plant. At that time, Ethyl manufactured a gasoline additive, and the manufacturing process utilized sodium as a chemical ingredient. The Sodium Plant generated the required ingredient by heating and melting solid salt using electrolysis, thereby reducing the salt to its separate components of sodium and chlorine. This process occurred in so-called sodium cells, which were situated in buildings called sodium cell houses. The sodium cell houses were partially enclosed, with a five-foot gap running the length of each wall enabling powerful roof fans to draw outside air into the cell house. Two sodium cell houses operated in the 1950s and each contained 77 sodium cells. Spaced about 18 inches apart, the sodium cells were approximately 15-feet high and had a perimeter of about seven feet. Most significantly, the top half of each cell was coated with a spray-on asbestos insulation.

Because the sodium cells would gradually lose insulation capacity and efficiency, each cell had a life of about two years. Thus, one or two cells was refurbished each week, requiring workers to remove the cell from its cell house, strip off the remaining insulation, and rebuild it. During Dr. Gaddy's time at Ethyl, Limpet air guns were used to insulate the refurbished sodium cells. Multiple times each week, Ethyl employees loaded Limpet guns with asbestos fibers and sprayed the sodium cells in an open-air brick shed about 20 feet from one of the cell houses. Even when individual cells were removed for this process, the Sodium Plant continued to operate.

Other evidence indicated that the sodium cells were not the only insulated items in the Sodium Plant creating potential asbestos exposure. Pipes throughout the plant were insulated, and maintaining them required operators to tear out and replace piping on a daily basis. Significant amounts of asbestos were still present at the plant when it was dismantled in the 1980s.

No. 20-30209
c/w No. 20-30242

Dr. Gaddy's role as a chemical engineer involved providing technical advice to operators, but it did not typically require him to personally operate the sodium cells and he generally worked out of a separate office. But at least on a weekly basis he would work in proximity to the sodium cells making measurements or conducting other tests, and he testified that Ethyl employees stripped insulation cells in areas where he worked. For at least one four- or five-week period, however, during a labor strike at the plant, Dr. Gaddy worked as an operator in constant proximity with the sodium cells for 12-hour shifts six days per week.

## C. Procedural History

After his mesothelioma diagnosis, Dr. Gaddy filed suit in state court against several defendants, including Ethyl, International Paper, and Owens-Illinois. The claims against all defendants except Ethyl were settled during the summer of 2019. As the only remaining defendant, Ethyl asserted diversity jurisdiction and removed the case to federal court.

A week-long jury trial was held in November 2019. At the close of evidence, both parties made Rule 50 motions for judgment as a matter of law and both motions were denied. After deliberation, the jury returned a verdict in favor of Plaintiffs, finding Ethyl both negligent and strictly liable and awarding $7,500,000 in general damages and an additional $250,661 in medical expenses.[2] The jury also answered questions on the jury form allocating legal responsibility to Ethyl, International Paper, and Owens-Illinois. Accordingly, under Louisiana law preventing double recovery, Ethyl was entitled to settlement credits for the shares of liability owed by the settling parties, thereby reducing Ethyl's liability by two-thirds.

---

[2] The general damages amount consisted of $2,500,000 for physical pain and suffering; $2,500,000 for mental anguish; and $2,500,000 for loss of enjoyment of life.

No. 20-30209
c/w No. 20-30242

Ethyl then renewed its motion for judgment as a matter of law, and filed a motion for a new trial or, alternatively, for remittitur. The district court denied Ethyl's renewed motion for judgment as a matter of law and motion for a new trial. But, finding the jury's general damage award excessive, it granted in part the motion for remittitur and reduced the total general damages amount from $7,500,000 to $3,000,000.[3]

Plaintiffs also renewed their motion for judgment as a matter of law, asserting that the jury's attribution of liability to Owens-Illinois was erroneous because it lacked a legally sufficient evidentiary basis. The district court denied the motion. Both Ethyl and Plaintiffs separately appealed from the same final judgment, and the two cases were subsequently consolidated.

## II. STANDARDS OF REVIEW

### A. Motion for Judgment as a Matter of Law

"A motion for judgment as a matter of law . . . in an action tried by jury is a challenge to the legal sufficiency of the evidence supporting the jury's verdict." *Hiltgen v. Sumrall*, 47 F.3d 695, 699 (5th Cir. 1995). We review a district court's denial of a motion for judgment as a matter of law *de novo*, *Travis v. Bd. of Regents of the Univ. of Tex. Sys.*, 122 F.3d 259, 263 (5th Cir. 1997), but employ "the same standard to review the verdict that the district court used in first passing on the motion," *Hiltgen*, 47 F.3d at 699. That standard is exceedingly deferential: "[a] jury verdict must be upheld unless there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did." *Id.* at 700 (internal quotations and citation omitted). Moreover, a jury is entitled to "draw reasonable inferences from the evidence, and those inferences may constitute sufficient proof to support a

---

[3] Plaintiffs accepted the district court's remittitur order, but Ethyl contends on appeal that the amount should be further reduced.

verdict." *Rideau v. Parkem Indus. Servs. Inc.*, 917 F.2d 892, 897 (5th Cir. 1990).

On appeal, we are "bound to view the evidence and all reasonable inferences in the light most favorable to the jury's determination." *Id.* Granting judgment as a matter of law contrary to a jury's determination is proper only if, considering all of the evidence, "the facts and inferences point so strongly and overwhelmingly in favor of one party that the [c]ourt believes that reasonable men could not arrive at a contrary verdict." *Rubinstein v. Adm'rs of Tulane Educ. Fund*, 218 F.3d 392, 401 (5th Cir. 2000) (quotations and citation omitted).

## B. Motion for a New Trial

A new trial may be granted under Federal Rule of Civil Procedure 59 if the trial court finds that the verdict is against the weight of evidence; the damages awarded are excessive; the trial was unfair; or prejudicial error was committed. *Seidman v. Am. Airlines, Inc.*, 923 F.2d 1134, 1140 (5th Cir. 1991) (citation omitted). We review the denial of a motion for a new trial under an abuse of discretion standard. *Lincoln v. Case*, 340 F.3d 283, 290 (5th Cir. 2003). Where a jury verdict is at issue, no abuse of discretion exists "unless there is a complete absence of evidence to support the verdict." *Benson v. Tyson Foods, Inc.*, 889 F.3d 233, 234 (5th Cir. 2018) (quoting *Sam's Style Shop v. Cosmos Broad. Corp.*, 694 F.2d 998, 1006 (5th Cir. 1982)).

## C. Reasonableness of General Damages Award

"This [c]ourt reviews the grant of a remittitur for abuse of discretion, and where the trial court already has invoked its discretion in granting a remittitur, our scope of review is even narrower than usual." *EEOC v. Serv. Temps Inc.*, 679 F.3d 323, 337 (5th Cir. 2012) (internal quotations and citations omitted). Moreover, we "cannot judge the justification of damages by mere comparison with the awards upheld or reversed in other cases"

because "[e]ach case presents its own facts." *Winbourne v. E. Airlines, Inc.*, 758 F.2d 1016, 1018 (5th Cir. 1984), *cert. denied*, 474 U.S. 1036 (1985) (citation omitted).

## III. DISCUSSION

### A. Liability Allocation

The jury concluded that Dr. Gaddy's mesothelioma was caused in part by exposure to Kaylo during his time at International Paper. So, it attributed liability to Owens-Illinois and reduced Ethyl's share of liability in turn. But Plaintiffs contend that the jury lacked sufficient evidence to reach those factual conclusions and thus the district court erred in denying their motion for judgment as a matter of law.

First, Plaintiffs assert that Louisiana law required Ethyl to prove by a preponderance of evidence that Owens-Illinois caused Dr. Gaddy's mesothelioma, but that Ethyl failed to satisfy its evidentiary burden and only enabled the jury to reach its liability conclusion by supplying facts not in evidence during closing argument. They posit that both Owens-Illinois and Owens-Corning manufactured Kaylo. And "Ethyl did not show, more likely than not, that Owens-Illinois rather than Owens-Corning was a cause of [Dr.] Gaddy's mesothelioma." In their view, the jury could not have concluded that Owens-Illinois was the sole manufacturer of Kaylo without reference to Ethyl's statement during closing argument identifying Owens-Corning as a distributor, rather than a manufacturer, of Kaylo—and that was a fact not in evidence. Second, they argue that no evidence supported the finding that any Owens-Illinois insulation product ever reached International Paper or that Dr. Gaddy was ever exposed to such a product. We find these arguments unpersuasive.

To begin, the standard under which the district court and this court must review a jury's verdict is extremely deferential. A jury verdict may be

No. 20-30209
c/w No. 20-30242

overturned only if "there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did." *Hiltgen*, 47 F.3d at 700 (internal quotations and citation omitted). Moreover, the jury is entitled to draw inferences from the evidence, and we are bound to view those inferences "in the light most favorable to the jury's determination." *Rideau*, 917 F.2d at 897. We cannot disregard the jury's reasonable factual inferences, reweigh the evidence, or reevaluate the jury's credibility determinations. *Glass v. Petro-Tex Chem. Corp.*, 757 F.2d 1554, 1559 (5th Cir. 1985).

That standard simply is not met here. Multiple witnesses testified at trial that Kaylo was manufactured by Owens-Illinois when Dr. Gaddy worked at International Paper; invoices showed that Kaylo was shipped to International Paper's Springhill plant when Dr. Gaddy worked there; no evidence suggested that any other type of insulation was used at International Paper; Dr. Gaddy testified that he regularly came into close contact with pipe insulation at the Springhill plant; and one expert witness testified that if the contacts with insulation described by Dr. Gaddy were with Kaylo, they would have resulted in significant exposures to asbestos. The jury drew from this evidence the inferences that (1) Kaylo manufactured by Owens-Illinois was used throughout the International Paper plant and (2) that the nature of Dr. Gaddy's work there resulted in significant exposure to that Kaylo and the asbestos it contained. We cannot say that these inferences were unreasonable.

Nor do Ethyl's closing-argument statements alter our conclusion. True, Owens-Corning was not expressly identified as a distributor of Kaylo prior to Ethyl's closing argument. But whatever Owens-Corning's role, it was irrelevant to the jury's findings because Plaintiffs never argued at trial that Owens-Corning or anyone else may have manufactured the Kaylo shipped to International Paper. To reach such a conclusion, the jury would have had to independently draw that inference from the invoice headings

alone. While multiple witnesses testified that Owens-Illinois manufactured Kaylo, no evidence presented to the jury indicated that any entity other than Owens-Illinois produced Kaylo during the relevant time period. As the district court correctly noted, "[t]o the extent Plaintiffs want to argue that another company's asbestos-containing products were used at International Paper, they should have done so at trial."

## B. Strict Liability

Ethyl appeals the district court's denial of its motion for judgment as a matter of law with respect to the jury's strict liability finding. Asserting that any asbestos exposure Dr. Gaddy experienced at Ethyl resulted from asbestos dust disturbed by the maintenance of sodium cells, Ethyl contends that maintenance is a temporary condition to which strict liability—as a matter of law—does not attach. But that categorical framing of the legal standard is incorrect.

When a case involves long-latency occupational diseases like mesothelioma, the law in effect at the time of the exposure applies. *Watts v. Georgia-Pac. Corp.*, 2012-0620 (La. App. 1 Cir. 9/16/13), 135 So. 3d 53, 59 (citing *Cole v. Celotex Corp.*, 599 So. 2d 1058, 1066 (La. 1992)). Here, the applicable law is the Louisiana Civil Code article 2317 in effect between 1955 and 1959. Proving strict liability under article 2317 requires plaintiffs to establish three elements: (1) the thing which caused injury was in the care, custody, and control of the defendant; (2) the thing had *a defect* which created an unreasonable risk of harm; and (3) the injuries in question were caused by the defect. *Palermo v. Port of New Orleans*, 2004-1804 (La. App. 4 Cir. 3/15/06), 933 So. 2d 168, 179. Only the second element is at issue here.

A defect under article 2317 "is a flaw or condition of relative permanence inherent in the thing as one of its qualities." *Crane v. Exxon Corp., U.S.A.*, 613 So. 2d 214, 219 (La. Ct. App. 1992). Thus, "[a] temporary

condition may constitute a hazard, but it does not constitute a defect as contemplated by article 2317." *Id.* Ethyl asserts that "[c]onditions that exist during construction or maintenance of [] premises are temporary." But rather than identify specific kinds of activities, the defect inquiry focuses instead on whether the conditions are permanent or temporary. That is not the same as the essentially bright-line test Ethyl proposes, namely, that construction or maintenance activities are *always* temporary and thus *never* a defect. Ethyl is correct that strict liability cases do frequently involve construction or maintenance activities, and that is because such circumstances are often temporary. But not always, and not here.

Ethyl cites several cases declining to apply strict liability to maintenance and construction activities. *See, e.g.*, *Hammons v. Forest Oil Corp.*, No. 06-9173, 2008 WL 348765 (E.D. La. 2008); *Dauzat v. Thompson Constr. Co.*, 839 So. 2d 319 (La. App. 5 Cir. 2003); *Barron v. Webb*, 698 So. 2d 727 (La. App. 2 Cir. 1997); *Kyle v. Bougalusa*, 506 So. 2d 719 (La. App. 1 Cir. 1987). It especially relies on *Smith v. Union Carbide Corp.*, No. 13-6323, 2014 WL 4930457 (E.D. La. 2014). In *Smith*, the plaintiff was temporarily contracted for limited periods of time to perform work on the defendant's premises that exposed him to asbestos pipe insulation. *Id.* at *1. The nature of the work he performed involved cutting and installing pipes and tearing out asbestos pipe insulation, and his temporary employment status suggests that this was not ongoing, constant maintenance. *Id.* The court found that this could not constitute a defect under article 2317 because the plaintiff's exposure to asbestos dust "occurred during construction or maintenance activities on the premises" and the dusty conditions created by those activities "were temporary in nature." *Id.* at 7.

But the facts of these cases are inapposite to this case in that they all involved injuries caused by more obviously temporary activities of a once-and-done nature. Here, the testimony at trial showed that the conditions

causing asbestos disturbance—namely, the tearing out and reconstruction of sodium cells—was almost constant, "part and parcel of the Baton Rouge facility's operation." Refurbishment of sodium cells occurred consistently and on a weekly basis. The district court noted that "the stripping and refurbishment of sodium cells was a constant and necessary activity to keep the plant operational" and concluded that it was "a standard operating procedure at the facility." Without it, "the sodium cell plant would cease to operate." Because the facts of this case simply do not resemble those in cases finding a temporary maintenance activity, we conclude that strict liability was appropriate here.

## C. Negligence

Ethyl also contends that the district court erred in denying its motion for a new trial because the jury's negligence finding "was clearly against the great weight of evidence." Here again, our standard of review is particularly stringent. While a district court may grant a new trial if the jury's verdict is against the weight of evidence, we review the district court's denial of a motion for a new trial under an abuse of discretion standard, and that standard is not met "unless there is a complete absence of evidence to support the verdict." *Benson*, 889 F.3d at 234 (quoting *Sam's Style Shop*, 694 F.2d at 1006). That cannot be said here.

First, Ethyl argues that no evidence indicated that any other company—acting under the same or similar circumstances at the time—did more than it to protect their employees from the known risks of asbestos. Ethyl cites no case law requiring Plaintiffs to show that Ethyl fell short of an industry standard or custom regarding safety protocols, and we are aware of none. Cases that do address the subject treat such standards as relevant but not dispositive. *See, e.g.*, *Pinsonneault v. Merchants & Farmers Bank & Tr. Co.*, 99-12 (La. App. 3 Cir. 7/21/99), 738 So. 2d 172, 190, *writ granted*, 99-2681

(La. 2/4/00), 753 So. 2d 842 ("[C]ompliance with industry standards alone is not synonymous with reasonable behavior."). Thus, evidence concerning the safety practices of other companies in the late 1950s, whether more or less stringent than Ethyl's protocols, may have aided the jury's deliberations, but such evidence was not necessary to find that Ethyl had breached its standard of care. Its absence does not entitle Ethyl to a new trial.

Second, Ethyl insists that, between 1955 and 1959, it could not have foreseen the danger that mesothelioma specifically—as opposed to other possible illnesses—might result from asbestos exposure Dr. Gaddy may have sustained. Given the state of medical knowledge at the time, Ethyl notes that it might have known that prolonged and frequent exposure to asbestos could create a risk of asbestosis or lung cancer, but that it could not have foreseen— and Plaintiffs presented no evidence that it did or should have foreseen—that purportedly brief and infrequent exposures like Dr. Gaddy's could cause mesothelioma or any other asbestos-related disease. This argument is also unavailing.

While Ethyl seeks to minimize the amount of Dr. Gaddy's exposure, there is no question that evidence before the jury showed that he could have been exposed to some degree. The jury was entitled to weigh the facts and evidence to determine *how much* exposure he sustained. As the district court noted, "[t]he jury simply believed Plaintiffs' version of the facts and rejected [Ethyl's] version."

But even if Dr. Gaddy was exposed to asbestos in high doses, Ethyl argues that medical knowledge available at the time rendered it impossible to foresee this particular result because no link between asbestos and mesothelioma was discovered until 1964 at the earliest. Quoting *Pitre v. Employers Liability Assurance Corp.*, Ethyl notes that foreseeability requires "only that precautions be taken against occurrences that can and should be

foreseen; it does not require that one anticipate unusual and improbable, though entirely possible happenings." 234 So. 2d 847, 852 (La. App. 1979).

The district court correctly identified the flaw in this argument, noting that "[t]he medical community recognized the link between asbestos and other occupational illnesses, like asbestosis, as early as the 1930s, and lung cancer, as early as 1955." "The fact that Ethyl did not recognize the risk of mesothelioma *specifically* is not dispositive here because a jury could reasonably find that Ethyl was on notice that its practices did indeed create a risk of future physical injury for its employees."

Ethyl cites no cases contravening that conclusion. For example, *Pitre* involved a fair where a teenager at the baseball concession stand was winding up to pitch when he hit a nine-year-old boy with his hand. 234 So. 2d at 849. Struck in the head, the boy died. *Id.* Although conceding the evident danger attending proximity to people throwing baseballs, the court found that an injury caused by a winding-up pitcher's hand was so improbable that the fair organizers could not be held liable for failing to take precautions to prevent that kind of harm. *Id.* at 853. In contrast, the cause of injury here was not so bizarrely improbable. Ethyl knew that asbestos exposure could cause serious illness even if it could not foresee the precise nature of the disease. The jury was certainly presented with enough evidence to reach that conclusion. Accordingly, Ethyl is not entitled to a new trial.

**D. Expert Testimony**

Ethyl also contends that a new trial is required because the admission of expert testimony by Susan Raterman "prevented [it] from receiving a fair trial." Ms. Raterman was Plaintiffs' expert witness for industrial hygiene issues. She testified that fans in the sodium cell houses could have pulled asbestos fibers into the cell houses from the sodium cell refurbishment area

nearby, thereby exposing Dr. Gaddy. Ethyl refers to this as the "fiber drift" theory and insists it is nothing more than speculation.

We review the admission of expert testimony for an abuse of discretion, upholding the ruling unless it was manifestly erroneous. *Carlson v. Bioremedi Therapeutic Sys., Inc.*, 822 F.3d 194, 199 (5th Cir. 2016). Even if we find an abuse of discretion, we may still affirm unless the ruling affected the complaining party's substantial rights. *Id.*

The admissibility of expert testimony is governed by the standards set forth in Rule 702 of the Federal Rules of Evidence. FED. R. EVID. 702. The district court acts as a gate-keeper to ensure the proffered testimony is "both reliable and relevant." *Wells v. SmithKline Beecham Corp.*, 601 F.3d 375, 378 (5th Cir. 2010). But the court's gate-keeper role does not ultimately replace the adversarial system, where the jury acts as arbiter of the weight assigned to conflicting opinions. *Daubert v. Merrell Dow Pharma., Inc.*, 509 U.S. 579, 596 (1993).

The district court conducted a Rule 702 analysis and it was not manifestly erroneous. But even if it were, Ethyl has not shown a violation of its substantial rights. The jury could have reached the same conclusion about Dr. Gaddy's asbestos exposure during his time at Ethyl without any reference to the fiber drift theory. That was only one form of exposure discussed by Ms. Raterman; she also opined that Dr. Gaddy could have been exposed to disturbed asbestos in his direct work area around the sodium cells. Moreover, entirely putting aside Ms. Raterman's testimony, Plaintiffs presented ample evidence from which the jury could conclude that Dr. Gaddy was exposed to asbestos in the pilot plant.

## E. General Damages Award

Finally, unsatisfied with the district court's remittitur of the general damages award, Ethyl asserts that "$900,000 is the highest reasonable

No. 20-30209
c/w No. 20-30242

amount that could be awarded by a jury considering the facts and circumstances of this case."

A court may not disregard the facts of the case before it, but "[a] mainstay of the excessiveness determination is comparison to awards for similar injuries." *Salinas v. O'Neill*, 286 F.3d 827, 830 (5th Cir. 2002) (citation omitted). Under the maximum recovery rule, we will not remit damage awards below the maximum amount the jury could have awarded. *Id.*

After determining that the jury's award was excessive, the district court applied the maximum recovery rule and considered in detail a series of factually similar cases, concluding that juries in the relevant jurisdiction typically award between $1,500,00 and $3,000,000 for the types of injuries Dr. Gaddy sustained. Ethyl contends that none of the cases cited by the district court are squarely analogous to this one for a number of reasons—including Dr. Gaddy's advanced age; the close proximity of his diagnosis to his death; his statements that he did not suffer much pain; and the significant health issues he was already experiencing from heart disease. But the district court did not disregard these distinctions. It considered these factors in its remittitur analysis and even referenced them to justify distinguishing this case from others upholding awards larger than $3,000,000. Given its first-hand view of the trial testimony and evidence, the district court was in a far better position than we to review the effect of those factors on the damages award.

AFFIRMED.